IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHNNY PAUL COLLINS,

    Petitioner,                       No. CIV S-04-1516 DFL GGH P

    vs.

DAVID L. RUNNELS, et al.,        ORDER &

    Respondent.                 FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2000 conviction for the second degree robbery of Robert and Sim Yee (Cal. Penal Code §§ 211, 212.5(c)) and the first degree murder of Sim Yee (Cal. Penal Code § 187, 189). An allegation that the murder was committed during a robbery was also found true (Cal. Penal Code § 190.2(a)(17)). Petitioner is serving a sentence of life without the possibility of parole.

        Pending before the court is respondent's motion to dismiss filed October 27, 2005. Respondent argues that three of the four claims raised in the amended petition are barred by the statute of limitations. Respondent also argues one of these claims is not exhausted. Petitioner has filed a motion to stay this case pending exhaustion of the unexhausted claim.

After carefully considering the record, the court recommends that respondent's motion regarding the statute of limitations be granted. Because the statute of limitations would bar the one unexhausted claim, the court vacates the motion to dismiss based on lack of exhaustion as moot, and likewise vacates petitioner's motion to stay the case so that the unexhausted claim may be exhausted because that motion has become moot as well.

II. Background

>In order to put respondent's motion in context, the court will set forth the factual summary of petitioner's case contained in the opinion of the California Court of Appeal:
>
>*Prosecution case-in-chief*
>
>On October 22, 1998, at about 7:00 p.m., Robert Yee and his wife, Sim, were closing Bill's Market in Rio Linda, the business they had owned for 37 years. The Yees lived next door to the market. At around 7:15, as Mr. Yee was boarding the front door, three robbers (defendant, Anderson, and James M.) wearing ski masks pushed him into the store. Defendant carried a .38-caliber pistol. He and Anderson forced Mr. Yee into the back of the store while James M. went to the cash register area where Mrs. Yee was standing behind the counter.
>
>Defendant and Anderson forced Mr. Yee to lie down; taped his hands, mouth, and feet with duct tape; and hit him on the head with a heavy object. Anderson kicked Mr. Yee in the head. Defendant took Mr. Yee's ring and $60 from his wallet. Defendant obtained Mr. Yee's house keys. He and Anderson went to the residence.
>
>Mr. Yee was on the floor for 10 to 15 minutes. He struggled to free himself from the duct tape. At about the time he worked himself free, he heard his across-the-street neighbor, Steven Parrish, call for him.
>
>Mr. Parrish testified that at about 7:15 p.m., as he and a companion were standing on his front porch, he observed lights at Bill's Market. Mr. Parrish was concerned, because he knew the market normally was closed at that time. As he watched, he saw three or four "tall people" come out of the store, sneak around the side of the building, jump into a little dark sedan, and rush off in the direction of a local elementary school. [Footnote 2] Mr. Parrish ran across the street
>
>> [Footnote 2: A stolen blue 1987 Mazda sedan was found abandoned at the school. The car had been stolen from Carmichael the night before the robbery.]
>
>and found Mrs. Yee laying face down on the floor, behind the counter, bound with duct tape. Mr. Parrish heard movement in the back room and called out for Mr. Yee, who ran into the front of the store after freeing himself from the tape. Mr. Parrish and Mr. Yee then ran back to Mrs. Yee, who was not moving or breathing.

2

Mr. Yee, who was "real distraught," started ripping all the tape off of Mrs. Yee and hollering at her. The robbers had disabled the store's telephones by pulling out their wires. Mr. Parrish's companion returned to his house and telephoned 911. Mr. Parrish spoke to Mrs. Yee but got no response. He was unable to feel a pulse.

The robbers emptied the cash register of money, money orders and lottery tickets. Pieces of duct tape were found near Mrs. Yee's body. The Yee's house was ransacked; a mattress had been moved, and dresser drawers had been opened. The telephones were broken.

Dr. Robert Anthony performed an autopsy on Mrs. Yee. She had lost a fair amount of lung tissue, caused by the autoimmune disease scelerodera. The impaired lungs stressed and enlarged her heart. Her lung disease had reached a plateau and stabilized, and she had begun the occasional use of oxygen. Dr. Anthony and Mrs. Yee's attending physician both testified that she would have been at great risk of death by being unable to breathe, if she had been placed face down on the floor, or had her mouth covered with duct tape. Dr. Anthony opined that Mrs. Yee's death may have been caused by positional axphyxia, in which being placed prone prevented her from breathing effectively.

Steven Parrish's next-door neighbors were members of the Bable and Crawley families: Nevada Bables and her children, James M., Jennifer M. And Tiffany M.; Nevada Bables sister and brother-in-law, Chris Bables Crawley and James Crawley; Chris Crawley's son, Ivan, and her niece, Vanessa H.; James Crawley's cousin, defendant; and the son of some neighbors, Shaun Anderson. Anderson, defendant, and James M. were in a clique together called "Thug Life."

One to two weeks before the robbery of Bill's Market, Anderson, defendant, Marcus McGuire, and Jonathan Prentice were talking about robbing the market. McGuire was to be the getaway driver, but he dropped out before the plan was executed.

Later Anderson, defendant, James M., and Bables discussed a plan to wear disguises and to tie up the Yees with duct tape. They purchased grease paint, gloves, and black ski masks from Target.

The night before the robbery, defendant had separate conversations in his bedroom with Anderson and James M. Defendant had a .38 in his hand, but he did not threaten James M. with it.

On the afternoon of October 22, 1998, Anderson, Bables and defendant picked up James M. and went home to discuss the plan further. They went to Target to buy duct tape, and they picked up a Mazda 626 that Anderson or defendant had previously stolen as part of the plan.

About a half hour before dark, while James M.'s sister Tiffany and his cousin Vanessa were riding bicycles, Vanessa saw Anderson, Bables, defendant, and James M. leave the house in defendant's car and drive toward the market. Before the foursome left, defendant told the girls to go into the house after 30 minutes, even though Vanessa usually stayed outside until 8:00 or 9:00 p.m. The girls

1  went inside their house 20 to 25 minutes later, when it was getting dark.

2  While Anderson, defendant, and James M. drove off in the stolen car, Bables drove defendant's car to the elementary school. Anderson, defendant, and James M. drove around until it got dark at about 7:00 p.m., waiting for people to clear out of the market. Vanessa observed defendant in the driver's seat and Anderson and James elsewhere in the car.

3  Around 7:00 p.m., defendant parked the stolen car on the side of the market. Anderson testified that, just before entering the market, defendant "said that we could get out of the robbery now, but we'd be accomplices." Anderson felt he had no choice because he was afraid of defendant. Defendant told James M. that he could not back out of the plan because he was already involved as an accessory. Defendant threatened to kill James M. if he told anyone about the robbery. Anderson, defendant, and James M. entered the store; James M. locked the door. Mrs. Yee was at the counter; Mr. Yee was in the back of the store. Defendant pointed the .38 at the Yees. He told Mrs. Yee to "get on the ground before he kill her [her]." After James M. pulled the wires from the store's telephones, the robbers taped up the Yees, putting tape across their mouths, tying their feet together, and taping their hands behind their backs. Mrs. Yee was placed on her chest face down on the floor.

Anderson, defendant, and James M. each grabbed money from cash registers, drawers, boxes, and anywhere else they could find it. Someone took lottery tickets. Defendant took a ring from Mr. Yee while James M. took cigarettes. James M. heard defendant ask Mr. Yee for his keys. Anderson and defendant then entered the house. Anderson testified that he took the tape off Mrs. Yee's mouth before following defendant to the house.

Upon returning to the store, defendant and Anderson grabbed some cigarettes. The robbers returned to the stolen car and drove to the elementary school where Bables was waiting for them in defendant's car. They transferred everything from the stolen car to defendant's car and drove to a Kmart in Antelope, where they began scratching lottery tickets. While doing so, they agreed to say that they had found the tickets on the side of a road and that they had given them to Bables to cash in. After driving to various stores cashing winning tickets, they divided the proceeds equally. James M.'s share was close to $100.

After cashing the tickets, the foursome telephoned James M.'s uncle from a store to find out what was going on at the market. He told them that Mrs. Yee had died, but they did not believe him. The uncle met the foursome at the store and drove defendant home so that their arrival as a group "wouldn't look suspicious." Bables drove Anderson and James M. home.

Upon returning, James M. saw police cars at the market. Anderson, defendant, and James M. discussed how to keep the children in the household quiet. They called Vanessa and the other children into Bable's bedroom one at a time, and defendant told them he would hurt or kill them if they said anything.

About a week after the robbery, defendant told McGuire that, if any detectives questioned him, McGuire was to provide an alibi for James M. by saying that

4

James was at McGuire's house with McGuire on the night of the robbery, and that McGuire later dropped off James M. at a gas station. McGuire agreed to do so because defendant had threatened him and McGuire feared retaliation if he did not provide the alibi. McGuire initially told detectives the false alibi, but a month later he told them that James M. was not with him and that he, McGuire, did not know what had happened.

Using a computer tracking system, an agent for the California State Lottery identified nine retailers who redeemed lottery tickets originating from Bill's Market. The agent obtained videotapes from five of the retailers depicting a customer at the stores' counters when tickets were being cashed. The tapes depicted defendant or Bables cashing tickets. About $90 was paid out for the tickets. Some of the cashed tickets were recovered; one ticket bore the fingerprint of defendant.

At trial, Anderson admitted participating in the robbery but claimed defendant had coerced him into doing so by putting a gun to his head and threatening to kill him if he did not cooperate. Defendant planned the robbery because he needed money from the store "to get back to Arkansas to see [his] kids for Christmas." Defendant set a date for the robbery but changed it four or five times in a three-week period. Anderson did not take the plan seriously because it would be stupid to rob a store in their own neighborhood. Anderson claimed that, the day before the robbery, defendant threw him onto the ground, put a gun to his head, and threatened to kill him if he did not participate in the robbery.

Five days after the robbery, detectives contacted defendant and Bables after she acknowledged that she was one of the persons depicted in a photograph released to the media that showed her cashing stolen lottery tickets. In a search of Bable's bedroom, police found the shirt defendant had worn when cashing some stolen tickets. Police also found his .38 caliber handgun in his car.

Following the search, defendant gave a videotaped statement. Defendant said that he, Anderson, and Bables left their residence at 7:00 p.m. and drove to the Food Outlet on Watt Avenue. He had a wife and children in Arkansas, but he was romantically involved with Bables. En route to the store, he and Bables got into an argument and decided to drive home. As they neared 28th and Elkhorn, they noticed a bag containing lottery tickets in the median. He made a U-turn and retrieved the bag. They then went home so Bables could change her clothes and go back out to cash the tickets.

Two days later, defendant contacted detectives and told them he had not been truthful regarding Bables's son, James M. Defendant explained that he, Anderson, and Bables had a chance meeting with James M., McGuire, and Prentice at a gas station on Watt Avenue, and James was with Anderson, Bables, and defendant the rest of the night as they cashed tickets. During his interviews, defendant never claimed he was at home on the telephone at the time of the robbery.

On November 10, 1998, a detective attempted to arrest defendant for possession of stolen lottery tickets but was unable to locate him. The detective then began trying to find him in Arkansas. A sheriff's investigator in Arkansas located

defendant and took him into custody in January 1999. Defendant, Johnny Paul Collins, had in his possession a birth certificate, a social security card, an Arkansas identification card, and an Arkansas Department of Health card, all in the name of Michael Joseph Collins and all issued on January 4, 1999.

During his extradition hearing, defendant was overheard to blurt out in a loud voice that he "did not murder that woman, that there was three of them. And that they had only tied the woman up, and that she was on oxygen and he did not kill her."

*Defense*

At about 7:13 or 7:14 p.m. Pacific Standard Time on the day before the robbery defendant's wife, Catherine, made a 29-minute telephone call from the family home in Arkansas to defendant's residence.

At 7:10 p.m. Pacific Standard Time the day of the robbery, defendant's brother, Joey, made a telephone call from the family home in Arkansas to defendant's residence. This call, too, lasted 29 minutes. Defendant spoke with Joey for about 10 minutes, and then asked to speak to Catherine; he and Catherine conversed for 15 to 17 minutes. Joey decided to obtain his telephone records after defendant telephoned him from jail and said that he, defendant, remembered that Joey "was on the phone" on the day of the robbery. Joey had no knowledge of the robbery and no prearrangement to telephone defendant at that particular time. No one asked him to help create an alibi for defendant.

Defendant testified that, before coming to California in September 1998, he was having marital problems and believed Catherine was cheating on him. He drove to his cousin James Crawley's house in Rio Linda, where he stayed until the day of the robbery.

Defendant claimed he never discussed or planned a robbery, never threatened to kill Anderson if Anderson did not do as told, and did not ask McGuire to provide an alibi for anyone.

Defendant testified he was at Bable's house on the day of the robbery. He was in James Crawley's bedroom from about 3:30 or 4:00 p.m. until around 8:00 p.m. He received a telephone call from his brother, Joey, around 7:00 or 7:10 that evening. He talked first to Joey and then to Catherine. The entire call lasted about 30 minutes.

Defendant left the house with Anderson and Babes at about 8:00 p.m.; however, his wristwatch indicated approximately 7:00 p.m., because he had set it back one hour in anticipation of Pacific Standard time, which commenced in three more days. It was dark outside, and defendant did not notice any police cars at Bill's Market, which was about 250 feet away. The three drove to the Food Outlet, traveling on Elkhorn Boulevard. Defendant and Babes argued in the car for about 30 minutes and then defendant began driving back to the house.

As defendant drove, Anderson noticed something in the road. Defendant made a U-turn, reached down and picked up the item, which was a plastic bag full of

unused lottery tickets. They returned to the house so Bables could change into warmer clothing, and then went back out to cash the tickets. At that point they saw patrol cars at the market. Although defendant assumed the lottery tickets were probably stolen, he did not think they were connected to anything occurring at the market. After scratching the tickets and finding the winners, they traveled to several stores to cash the tickets a few at a time. They ended up with about $70 or $80 and returned home at around midnight or 1:00 a.m.

Defendant acknowledged that he returned to Arkansas after telling a detective he would remain in California until the matter was resolved. He also acknowledged obtaining pieces of false identification after learning he was wanted for armed robbery and capital murder.

Defendant acknowledged that, although detectives and Agent Lewandowski questioned him, he never mentioned that he was at home speaking on the telephone at the time of the robbery and murder. Defendant denied that he was in a stolen car on the night or the robbery; that he had anything to do with stealing the car, and that he had anything to do with Bables driving his car to the elementary school.

*Rebuttal*

Agent Lewandowski testified that, when defendant spoke to him on October 29, 1998, defendant stated he left Bable's house at approximately 7:00 p.m. Defendant said he "drove to the Food Outlet store located at the corner of Watt Avenue and Elkhorn Boulevard: and that he stayed in the Food Outlet parking lot for 30 to 35 minutes. At that time, defendant did not discuss daylight savings time or setting his watch back to standard time. Defendant said he left the house a second time at approximately 8:00 p.m. and went to the 8100 block of Watt Avenue, where he parked in the Kmart shopping center.

Respondent's Lodged Document no. 1, pp. 2-13.

III.  Discussion

Respondent argues that three of the four claims raised in petitioner's amended petition (including the unexhausted ineffective assistance of counsel claim) are barred by the statute of limitations.

The statute of limitations for federal habeas corpus petitions is set forth in 28 U.S.C. § 2244(d)(1):

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–

\\\\\

7

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

On March 19, 2003, the California Supreme Court denied petitioner's petition for review. Therefore, petitioner's conviction became final 90 days later on June 17, 2003. Bowen v. Roe, 188 F.3d 1157, 1158-59 (9th Cir. 1999) ("hold[ing] that the period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the [ninety-day] period within which a petitioner can file a petition for a writ of certiorari with the United States Supreme Court, whether or not the petitioner actually files such a petition."). Petitioner had until June 17, 2004, to file a timely federal petition.

Section 2244(d)(2) provides that the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation. On August 13, 2003, petitioner filed a habeas corpus petition with the California Supreme Court. On May 12, 2004, the California Supreme Court denied this petition. Adding the number of days petitioner's petition was pending in the California Supreme Court (273) to June 17, 2004, would make petitioner's federal petition due on or before March 27, 2005.

On August 2, 2004, petitioner filed his original petition in this court. This petition raised two claims:

      1. The failure to sever petitioner's trial violated the Fourteenth Amendment.
      2. The jury misconduct instruction (CALJIC 17.41.1) intruded on petitioner's right to an impartial jury.

On September 3, 2005, after the limitations period expired, petitioner filed the amended petition on which this action is proceeding which raised the following claims:

      1. Insufficient evidence to support the jury's finding of special circumstances.
      2. The failure to sever petitioner's trial violated the Fourteenth Amendment.
      3. Ineffective of trial and appellate counsel for failing to challenge CALJIC No. 2.72.
      4. Petitioner's sentence violates the Eighth Amendment.

Respondent argues that claims 1, 3 and 4 are barred by the statute of limitations because they were raised for the first time in the amended petition, which was filed after the limitations period ran.

Federal Rule 15(c)(2) provides that pleading amendments relate back to the date of the original pleading when the claim asserted in the amended plea "arose out of the conduct, transaction, or occurrence." The issue in this case is whether claims 1, 3 and 4 "relate back" to the original petition.

In <u>Mayle v. Felix</u>, 125 S.Ct. 2562 (2005), the pro se petitioner filed a petition for writ of habeas corpus within the AEDPA's one year statute of limitations. "Five months after the expiration of AEDPA's time limit, and eight months after the federal court appointed counsel to represent him, Felix filed an amended petition in which he added a new claim for relief." 125 S. Ct. at 2566. The Supreme Court held that claims relate back if they share a common "core of operative facts" uniting the original and newly asserted claims. 125 S. Ct. at 2572.

Claim 4 of the amended petition alleges that petitioner's sentence is cruel and unusual in violation of the Eighth Amendment. In support of this claim, petitioner argues, in essence, that there was not sufficient evidence to support the special circumstance finding. To succeed on this claim, petitioner would have to demonstrate that his sentence is disproportionate to the crime for which it was imposed. See <u>Solem v. Helm</u>, 463 U.S. 277, 103 S.Ct. 3001 (1983). To succeed on this claim, petitioner would have to demonstrate that persons convicted

based on similar facts were not sentenced to life without parole.[1]  In other words, the basis of petitioner's claim cannot be that there was not sufficient evidence to support the special circumstance finding.

Because the core of operative facts regarding claim 4 is different from the core of operative facts of either of the claims raised in the original petition, the court finds that claim 4 does not relate back to the original petition.  Accordingly, this claim is barred by the statute of limitations.

Were claim 3 exhausted, the court would find that this claim does not relate back.  In claim 3, petitioner alleges that trial counsel failed to adequately object to the trial court's reading of modified CALJIC 2.71 which defines "admission."  Petitioner argues that when reading CALJIC 2.71, the trial court erroneously admitted the phrase, "Evidence of an oral admission of [a] [the] defendant should be viewed with caution."

Quite clearly, the core of facts pertinent to the omission related to the specific jury instruction does not encompass facts directly related to either of the two claims filed on August 2, 2004 (severance and CALJIC 17.41.1).  Nor can a tortured relation back path be constructed based on a prejudice analysis, which might relate to some facts on the merits pertinent to the severance claim – that type of general relationship (all claims relate back because they are in some way connected with the merits) is precisely what Mayle v. Felix repudiated.

That brings us to the more difficult relation back issue, i.e., whether the insufficiency of the evidence regarding the special circumstances relates back to the severance issue.  Petitioner requested that his trial be severed from that of his co-defendant because the co-defendant's theory of the case was antagonistic to petitioner's "I was not there" defense.  Of

---

[1] In all likelihood, this claim would ultimately fail on the merits.  "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."  Ewing v. California, 538 U.S. 11, 21, 123 S.Ct. 1179 (2003).  This court would most likely find that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.

1  course, in determining whether to sever, the court might touch upon the state of the evidence
2  (pretrial), and whether the prosecution's potential evidence independent of the co-defendant
3  outweighed petitioner's protestations of absence.
4      Under California law, severance may be appropriate "'in the face of an
5  incriminating confession, prejudicial association with codefendants, likely confusion resulting
6  from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a
7  codefendant would give exonerating testimony.' (Fns.omitted.)" People v. Coffman, 34 Cal. 4th
8  1, 40 (2004), quoting People v. Massie , 66 Cal.2d 899, 917 (1967).  "'[T]o obtain severance on
9  the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that
10 [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone
11 demonstrates that both are guilty.' [Citation.] When, however, there exists sufficient independent
12 evidence against the moving defendant, it is not the conflict alone that demonstrates his or her
13 guilt, and antagonistic defenses do not compel severance. [Citation.]" Coffman, 34 Cal.4th at p.
14 41; see also  People v.Cummings (1993) 4 Cal.4th 1233, 1286 (1993) [antagonistic defenses
15 alone do not compel severance].)  Of course, sufficiency of the evidence focuses upon whether a
16 rational trier of facts could convict petitioner on the totality of evidence actually presented in
17 court, including any inculpatory evidence that the co-defendant might choose to put before the
18 jury.  The court does not find that the partial focus of the severance claim on the facts of the case
19 warrants relation back of the insufficiency claim.
20      First the temporal period for the two claims is different.  The severance issue
21 focuses somewhat upon the *potential* for evidence to be produced, while the insufficiency claim
22 focuses upon the quality of the evidence actually produced at trial.  More importantly, the
23 theories of the claims are dissimilar.  Severance is concerned with the fairness in having a hostile
24 co-defendant at trial; insufficiency is concerned with whether from a review of the totality of the
25 evidence a certain bare minimum of evidence has been produced on an element(s) of a charge.
26 Again, if claims relate back simply because in their analysis they may touch upon *some* of the

11

same facts, Mayle means nothing.  Rather, the core of the facts upon which each claim depends must be by and large the same and with the same major focus on the facts.  And, in this case, the insufficiency of the evidence claim focuses not so much, or hardly at all, on petitioner's alibi defense, but whether the facts of the crime, whoever committed it, suffice for establishing the requisites for special circumstances.  Thus, the insufficiency claim is even more removed from the severance issue and is focused on a mixed, discrete fact and law issue.

Therefore, the undersigned will not find that the insufficiency of the evidence relates back to earlier filed severance claim.  The only claim remaining in the case is that of severance.

*Conclusion*

Accordingly, IT IS HEREBY ORDERED:

1. Respondent's motion to dismiss based on exhaustion is vacated as moot;

2. Petitioner's motion to stay the action pending exhaustion is vacated as moot;

3. Petitioner's motions to continue the hearing date are vacated as moot;

Accordingly, IT IS HEREBY RECOMMENDED that claims 1, 3, and 4 be dismissed as time barred under AEDPA.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised

\\\\\

\\\\\

\\\\\

\\\\\

1 | that failure to file objections within the specified time may waive the right to appeal the District
2 | Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
3 | DATED: 3/28/06

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

coll1516.157