IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHNNY PAUL COLLINS,

    Petitioner,                      No. CIV S-04-1516 RRB GGH P

    vs.

DAVID L. RUNNELS, et al.,

    Respondents.                FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2000 conviction for the second degree robbery of Robert and Sim Yee (Cal. Penal Code §§ 211, 212.5(c)) and the first degree murder of Sim Yee (Cal. Penal Code §§ 187, 199). An allegation that the murder was committed during a robbery was also found true (Cal. Penal Code § 190.2(a)(17)). Petitioner is serving a sentence of life without the possibility of parole.

        This action is proceeding on the amended petition filed September 3, 2005, as to petitioner's claim that the trial court denied his constitutional right to a fair trial by denying his motion to sever his trial from that of his co-defendant, Anderson. The other claims raised in the amended petition have been dismissed. See September 27, 2006, order.

After carefully considering the record, the court recommends that the remaining claim be denied.

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The California Court of Appeal was the last state court to issue a reasoned decision as to this claim. Respondent's Lodged Documents 1, 3. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision).

/////

/////

III. <u>Factual Background</u>

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

*Prosecution case-in-chief*

On October 22, 1998, at about 7:00 p.m., Robert Yee and his wife, Sim, were closing Bill's Market in Rio Linda, the business they had owned for 37 years. The Yees lived next door to the market. At around 7:15, as Mr. Yee was boarding the front door, three robbers (defendant, Anderson, and James M.) wearing ski masks pushed him into the store. Defendant carried a .38-caliber pistol. He and Anderson forced Mr. Yee into the back of the store while James M. went to the cash register area where Mrs. Yee was standing behind the counter.

Defendant and Anderson forced Mr. Yee to lie down; taped his hands, mouth, and feet with duct tape; and hit him on the head with a heavy object. Anderson kicked Mr. Yee in the head. Defendant took Mr. Yee's ring and $60 from his wallet. Defendant obtained Mr. Yee's house keys. He and Anderson went to the residence.

Mr. Yee was on the floor for 10 to 15 minutes. He struggled to free himself from the duct tape. At about the time he worked himself free, he heard his across-the-street neighbor, Steven Parrish, call for him.

Mr. Parrish testified that at about 7:15 p.m., as he and a companion were standing on his front porch, he observed lights at Bill's Market. Mr. Parrish was concerned, because he knew the market normally was closed at that time. As he watched, he saw three or four "tall people" come out of the store, sneak around the side of the building, jump into a little dark sedan, and rush off in the direction of a local elementary school. [Footnote 2] Mr. Parrish ran across the street

> [Footnote 2: A stolen blue 1987 Mazda sedan was found abandoned at the school. The car had been stolen from Carmichael the night before the robbery.]

and found Mrs. Yee laying face down on the floor, behind the counter, bound with duct tape. Mr. Parrish heard movement in the back room and called out for Mr. Yee, who ran into the front of the store after freeing himself from the tape. Mr. Parrish and Mr. Yee then ran back to Mrs. Yee, who was not moving or breathing. Mr. Yee, who was "real distraught," started ripping all the tape off of Mrs. Yee and hollering at her. The robbers had disabled the store's telephones by pulling out their wires. Mr. Parrish's companion returned to his house and telephoned 911. Mr. Parrish spoke to Mrs. Yee but got no response. He was unable to feel a pulse.

The robbers emptied the cash register of money, money orders and lottery tickets. Pieces of duct tape were found near Mrs. Yee's body. The Yee's house was

4

ransacked; a mattress had been moved, and dresser drawers had been opened. The telephones were broken.

Dr. Robert Anthony performed an autopsy on Mrs. Yee. She had lost a fair amount of lung tissue, caused by the autoimmune disease scelerodera. The impaired lungs stressed and enlarged her heart. Her lung disease had reached a plateau and stabilized, and she had begun the occasional use of oxygen. Dr. Anthony and Mrs. Yee's attending physician both testified that she would have been at great risk of death by being unable to breathe, if she had been placed face down on the floor, or had her mouth covered with duct tape. Dr. Anthony opined that Mrs. Yee's death may have been caused by positional axphyxia, in which being placed prone prevented her from breathing effectively.

Steven Parrish's next-door neighbors were members of the Bable and Crawley families: Nevada Bables and her children, James M., Jennifer M. And Tiffany M.; Nevada Bables sister and brother-in-law, Chris Bables Crawley and James Crawley; Chris Crawley's son, Ivan, and her niece, Vanessa H.; James Crawley's cousin, defendant; and the son of some neighbors, Shaun Anderson. Anderson, defendant, and James M. were in a clique together called "Thug Life."

One to two weeks before the robbery of Bill's Market, Anderson, defendant, Marcus McGuire, and Jonathan Prentice were talking about robbing the market. McGuire was to be the getaway driver, but he dropped out before the plan was executed.

Later Anderson, defendant, James M., and Bables discussed a plan to wear disguises and to tie up the Yees with duct tape. They purchased grease paint, gloves, and black ski masks from Target.

The night before the robbery, defendant had separate conversations in his bedroom with Anderson and James M. Defendant had a .38 in his hand, but he did not threaten James M. with it.

On the afternoon of October 22, 1998, Anderson, Bables and defendant picked up James M. and went home to discuss the plan further. They went to Target to buy duct tape, and they picked up a Mazda 626 that Anderson or defendant had previously stolen as part of the plan.

About a half hour before dark, while James M.'s sister Tiffany and his cousin Vanessa were riding bicycles, Vanessa saw Anderson, Bables, defendant, and James M. leave the house in defendant's car and drive toward the market. Before the foursome left, defendant told the girls to go into the house after 30 minutes, even though Vanessa usually stayed outside until 8:00 or 9:00 p.m. The girls went inside their house 20 to 25 minutes later, when it was getting dark.

While Anderson, defendant, and James M. drove off in the stolen car, Bables drove defendant's car to the elementary school. Anderson, defendant, and James M. drove around until it got dark at about 7:00 p.m., waiting for people to clear out of the market. Vanessa observed defendant in the driver's seat and Anderson and James elsewhere in the car.

5

Around 7:00 p.m., defendant parked the stolen car on the side of the market. Anderson testified that, just before entering the market, defendant "said that we could get out of the robbery now, but we'd be accomplices." Anderson felt he had no choice because he was afraid of defendant. Defendant told James M. that he could not back out of the plan because he was already involved as an accessory. Defendant threatened to kill James M. if he told anyone about the robbery.

Anderson, defendant, and James M. entered the store; James M. locked the door. Mrs. Yee was at the counter; Mr. Yee was in the back of the store. Defendant pointed the .38 at the Yees. He told Mrs. Yee to "get on the ground before he kill her [sic]." After James M. pulled the wires from the store's telephones, the robbers taped up the Yees, putting tape across their mouths, tying their feet together, and taping their hands behind their backs. Mrs. Yee was placed on her chest face down on the floor.

Anderson, defendant, and James M. each grabbed money from cash registers, drawers, boxes, and anywhere else they could find it. Someone took lottery tickets. Defendant took a ring from Mr. Yee while James M. took cigarettes. James M. heard defendant ask Mr. Yee for his keys. Anderson and defendant then entered the house. Anderson testified that he took the tape off Mrs. Yee's mouth before following defendant to the house.

Upon returning to the store, defendant and Anderson grabbed some cigarettes. The robbers returned to the stolen car and drove to the elementary school where Bables was waiting for them in defendant's car. They transferred everything from the stolen car to defendant's car and drove to a Kmart in Antelope, where they began scratching lottery tickets. While doing so, they agreed to say that they had found the tickets on the side of a road and that they had given them to Bables to cash in. After driving to various stores cashing winning tickets, they divided the proceeds equally. James M.'s share was close to $100.

After cashing the tickets, the foursome telephoned James M.'s uncle from a store to find out what was going on at the market. He told them that Mrs. Yee had died, but they did not believe him. The uncle met the foursome at the store and drove defendant home so that their arrival as a group "wouldn't look suspicious." Bables drove Anderson and James M. home.

Upon returning, James M. saw police cars at the market. Anderson, defendant, and James M. discussed how to keep the children in the household quiet. They called Vanessa and the other children into Bable's bedroom one at a time, and defendant told them he would hurt or kill them if they said anything.

About a week after the robbery, defendant told McGuire that, if any detectives questioned him, McGuire was to provide an alibi for James M. by saying that James was at McGuire's house with McGuire on the night of the robbery, and that McGuire later dropped off James M. at a gas station. McGuire agreed to do so because defendant had threatened him and McGuire feared retaliation if he did not provide the alibi. McGuire initially told detectives the false alibi, but a month later he told them that James M. was not with him and that he, McGuire, did not know what had happened.

6

Using a computer tracking system, an agent for the California State Lottery identified nine retailers who redeemed lottery tickets originating from Bill's Market. The agent obtained videotapes from five of the retailers depicting a customer at the stores' counters when tickets were being cashed. The tapes depicted defendant or Bables cashing tickets. About $90 was paid out for the tickets. Some of the cashed tickets were recovered; one ticket bore the fingerprint of defendant.

At trial, Anderson admitted participating in the robbery but claimed defendant had coerced him into doing so by putting a gun to his head and threatening to kill him if he did not cooperate. Defendant planned the robbery because he needed money from the store "to get back to Arkansas to see [his] kids for Christmas." Defendant set a date for the robbery but changed it four or five times in a three-week period. Anderson did not take the plan seriously because it would be stupid to rob a store in their own neighborhood. Anderson claimed that, the day before the robbery, defendant threw him onto the ground, put a gun to his head, and threatened to kill him if he did not participate in the robbery.

Five days after the robbery, detectives contacted defendant and Bables after she acknowledged that she was one of the persons depicted in a photograph released to the media that showed her cashing stolen lottery tickets. In a search of Bable's bedroom, police found the shirt defendant had worn when cashing some stolen tickets. Police also found his .38 caliber handgun in his car.

Following the search, defendant gave a videotaped statement. Defendant said that he, Anderson, and Bables left their residence at 7:00 p.m. and drove to the Food Outlet on Watt Avenue. He had a wife and children in Arkansas, but he was romantically involved with Bables. En route to the store, he and Bables got into an argument and decided to drive home. As they neared 28th and Elkhorn, they noticed a bag containing lottery tickets in the median. He made a U-turn and retrieved the bag. They then went home so Bables could change her clothes and go back out to cash the tickets.

Two days later, defendant contacted detectives and told them he had not been truthful regarding Bables's son, James M. Defendant explained that he, Anderson, and Bables had a chance meeting with James M., McGuire, and Prentice at a gas station on Watt Avenue, and James was with Anderson, Bables, and defendant the rest of the night as they cashed tickets. During his interviews, defendant never claimed he was at home on the telephone at the time of the robbery.

On November 10, 1998, a detective attempted to arrest defendant for possession of stolen lottery tickets but was unable to locate him. The detective then began trying to find him in Arkansas. A sheriff's investigator in Arkansas located defendant and took him into custody in January 1999. Defendant, Johnny Paul Collins, had in his possession a birth certificate, a social security card, an Arkansas identification card, and an Arkansas Department of Health card, all in the name of Michael Joseph Collins and all issued on January 4, 1999.

During his extradition hearing, defendant was overheard to blurt out in a loud voice that he "did not murder that woman, that there was three of them. And that

7

they had only tied the woman up, and that she was on oxygen and he did not kill her."

*Defense*

At about 7:13 or 7:14 p.m. Pacific Standard Time on the day before the robbery defendant's wife, Catherine, made a 29-minute telephone call from the family home in Arkansas to defendant's residence.

At 7:10 p.m. Pacific Standard Time the day of the robbery, defendant's brother, Joey, made a telephone call from the family home in Arkansas to defendant's residence. This call, too, lasted 29 minutes. Defendant spoke with Joey for about 10 minutes, and then asked to speak to Catherine; he and Catherine conversed for 15 to 17 minutes. Joey decided to obtain his telephone records after defendant telephoned him from jail and said that he, defendant, remembered that Joey "was on the phone" on the day of the robbery. Joey had no knowledge of the robbery and no prearrangement to telephone defendant at that particular time. No one asked him to help create an alibi for defendant.

Defendant testified that, before coming to California in September 1998, he was having marital problems and believed Catherine was cheating on him. He drove to his cousin James Crawley's house in Rio Linda, where he stayed until the day of the robbery.

Defendant claimed he never discussed or planned a robbery, never threatened to kill Anderson if Anderson did not do as told, and did not ask McGuire to provide an alibi for anyone.

Defendant testified he was at Bable's house on the day of the robbery. He was in James Crawley's bedroom from about 3:30 or 4:00 p.m. until around 8:00 p.m. He received a telephone call from his brother, Joey, around 7:00 or 7:10 that evening. He talked first to Joey and then to Catherine. The entire call lasted about 30 minutes.

Defendant left the house with Anderson and Bables at about 8:00 p.m.; however, his wristwatch indicated approximately 7:00 p.m., because he had set it back one hour in anticipation of Pacific Standard time, which commenced in three more days. It was dark outside, and defendant did not notice any police cars at Bill's Market, which was about 250 feet away. The three drove to the Food Outlet, traveling on Elkhorn Boulevard. Defendant and Bables argued in the car for about 30 minutes and then defendant began driving back to the house.

As defendant drove, Anderson noticed something in the road. Defendant made a U-turn, reached down and picked up the item, which was a plastic bag full of unused lottery tickets. They returned to the house so Bables could change into warmer clothing, and then went back out to cash the tickets. At that point they saw patrol cars at the market. Although defendant assumed the lottery tickets were probably stolen, he did not think they were connected to anything occurring at the market. After scratching the tickets and finding the winners, they traveled to several stores to cash the tickets a few at a time. They ended up with about $70 or $80 and returned home at around midnight or 1:00 a.m.

8

      Defendant acknowledged that he returned to Arkansas after telling a detective he would remain in California until the matter was resolved.  He also acknowledged obtaining pieces of false identification after learning he was wanted for armed robbery and capital murder.

      Defendant acknowledged that, although detectives and Agent Lewandowski questioned him, he never mentioned that he was at home speaking on the telephone at the time of the robbery and murder.  Defendant denied that he was in a stolen car on the night or the robbery; that he had anything to do with stealing the car, and that he had anything to do with Bables driving his car to the elementary school.

*Rebuttal*

      Agent Lewandowski testified that, when defendant spoke to him on October 29, 1998, defendant stated he left Bable's house at approximately 7:00 p.m. Defendant said he "drove to the Food Outlet store located at the corner of Watt Avenue and Elkhorn Boulevard: and that he stayed in the Food Outlet parking lot for 30 to 35 minutes.  At that time, defendant did not discuss daylight savings time or setting his watch back to standard time.  Defendant said he left the house a second time at approximately 8:00 p.m. and went to the 8100 block of Watt Avenue, where he parked in the Kmart shopping center.

Respondent's Lodged Document No. 1, pp. 2-13.

IV. <u>Discussion</u>

      Petitioner argues that the trial court denied his constitutional right to a fair trial by denying his motion to sever his trial from that of his co-defendant, Anderson.  Petitioner argues that the motion to sever should have been granted because he and Anderson had mutually antagonistic defenses.

      In denying this claim, the California Court of Appeal found as follows,

      Prior to trial, defendant filed a motion to sever trials or for dual juries, arguing, "[t]he anticipated defenses will act as inculpatory evidence against the other defendant."  In its ruling denying the motion, the trial court addressed the question "whether the antagonism of the defenses between Mr. Collins and Mr. Anderson warrants" severance, as follows:

      "And it's clear that there is an antagonism between the defendants and their defenses, that there is an attempt that will be made by Mr. Anderson to shift and largely place blame on Mr. Collins during the course of this trial and attribute Mr. Anderson's conduct to coercion, duress and to suggest that Mr. Collins was the master mind and also the force behind the crime. [¶] In reviewing the cases submitted in the briefing dealing with the issue of antagonistic defenses, it seems clear that the courts have recognized the long[-]standing preference for joint trials

9

and the policy reasons behind them. [¶] In this case, the participation of the defendants is alleged by the [P]eople, in any event, is pretty much joint participation from beginning to end. [¶] The three people acted together, these two defendants before the Court acting together, entering the store, participation in restraining the victims, ransacking the store, the damage done and leaving together. [¶] They were in the car together, apparently. They made statements to household members somewhat together. They were seen in a room together prior to the crime, at least that would be the testimony of one of the witnesses presented by the [P]eople. [¶] So this is very much a case which involves joint participation or an allegation of joint participation. I understand that's not the position of the defense, that Mr. Collins is attempting to proffer a partial alibi of sorts and to deny his presence. [¶] However, I don't find that the defense in this case is so antagonistic as to render a joint trial to be inherently unfair to them in light of the preference for joint trial and the policy considerations in favor of having all issues aired before one jury at one time so that they can sort out and determine, as best they can, what the true facts of this case are."

Following the verdicts, defendants moved for a new trial on the ground that the trial court should have granted the motion to sever. Following argument, the trial court explained its denial of the motion as follows:

"The Court had previously denied the pretrial Motion to Sever made on behalf of Mr. Collins. [¶] I considered the arguments regarding antagonistic defense and potential prejudice as [against] Mr. Collins in a joint trial. [¶] The Court considered that offer as presented by the Defense at the time, as well as the case law regarding this matter and the preference for joint trials. [¶] The Court feels that the policy reasons for supporting joint trial very much existed in this case which is to allow the jury, the finders of fact and finders of the truth, to have, hopefully, a full and more meaningful opportunity to review all the evidence. [¶] The fact that Mr. Collins and Mr. Anderson had some conflicting positions regarding their Defenses is true. But it is also the fact that the jury is in a better position to [ferret] out the true circumstances as they are presented with an understanding of the–fuller understanding of the facts. [¶] It's also true that a fair number of the factual relationship between Mr. Collins and Mr. Anderson was, in fact, not presented to the jury. The Court did not allow them to hear quite a bit about–actually, really anything about the prior criminal activities together which amounted to prior robberies and prior car thefts and other theft-related crimes. That was all very carefully excised and not presented to the jury so has [sic] to prejudice Mr. Collins or Mr. Anderson. [¶] After considering the evidence that was presented, in the Court's view, there was nothing that transpired during the trial that made the Court regret it's [sic] pretrial ruling on the matter. [¶] The presentation of the respective defenses was as anticipated. But I do not feel Mr. Collins was prejudiced by the presentation of evidence. [¶] I feel that the evidence that was presented in this trial, largely would have been presented in an independent trial against Mr. Collins as stated by [the prosecutor]. [¶] In this case, [James M.], in the Court's view, is compelling and quite credible witness[] while under the circumstances. While he was certainly an accomplice–an admitted accomplice in the crime, he was offered some degree of leniency. [¶] In the Court's view, he testified credibly. And his testimony was amply corroborated by a number of other circumstantial evidence that was offered up by the People. [¶] In other words, I guess what I'm trying to get at: Between the testimony of

[Vanessa H.]; the testimony of [James M.]; and the confluence of all the circumstantial evidence, in the Court's view this was a compelling and strong case for the People against Mr. Collins, and would have been even absent Mr. Anderson's testimony, and absent Mr. Anderson's assertion that Mr. Collins was a bullier, and Mr. Collins pressured him to do the crime. [¶] It's quite clear from [James M.'s] testimony that Mr. Collins was the instigator and one of the prime movers, and the other two were very much involved as well–but that's not before me. [¶] Oh, and I also wanted to comment on the alibi.  I heard the alibi witness and [the] alibi defense offered.  And certainly Mr. Collins is entitled to present such defense at his trial.  But it was, in the Court's view, that his brother, Mr. Joey Collins, was unbelievable in my view in light of all the other evidence that was being offered in the case. [¶] Therefore, I find that there was no prejudice whatsoever by the trying of these cases jointly, and deny the Motion for New Trial on that basis."

*Analysis*

"Section 1098 provides: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials...' In People v. Boyde (1988) 46 Cal.3d 212, 231-232 [250 Cal.Rptr. 83, 758 P.2d 25] the Supreme Court recognized that this section was the Legislature's expression of preference for joint trials.  'The statute nevertheless permits the trial court to order separate trials, and the decision to do so is one "largely within the discretion of the trial court." [Citations.] Whether denial of a motion to sever constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion to sever.'  (Ibid.)" (People v. Greenberger (1977) 58 Cal.App.4th 298, 343.)

"'After trial, of course, the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law.' [Citation.] The appellate court looks 'to the evidence actually introduced at trial' in making this latter determination. [Citation.] In such analysis the Supreme Court has stated: 'We do not believe that we should reverse a conviction achieved at a joint trial in the absence of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial.  Although we recognize the importance of the preservation of the procedural safeguard of a separate trial, the Legislature has decreed joint trials to be the rule and separate trials the exception...We must weigh the prejudicial impact of all of the significant effects that may reasonably be assumed to have stemmed from erroneous denial of a separate trial.' [Citation.]" (People v. Greenberger, supra, 48 Cal.App.4th at p. 343.)

"The Supreme Court has characterized a trial in which the defendants are charged with common crimes against common victims as the classic situation for joint trials. [Citations.] In [People v. Turner (1984) 37 Cal.3d 302] the defendant argued that this defense would conflict with that of the codefendant, allowing the People to sit back and watch the defendants become adversaries.  The court observed that '...if that point has merit, separate trial would appear mandatory in almost every case.' [Citation.] The court in People v. Boyd, supra, 46 Cal.3d 212, 232 observed: 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials

11

1    none has found an abuse of discretion or reversed a conviction on this basis.' [¶]
     The Supreme Court, recognizing that few California cases have discussed what
2    constitutes an 'antagonistic defense,' referred to federal authority and concluded
     that the concept is construed very narrowly. [People v. Hardy (1992) 2 Cal.4th at
3    86, 168.]" (People v. Greenberger, supra, 58 Cal.App.4th at p. 344.)

4    People v. Hardy, supra, 2 Cal.4th at 86 explained, "[A]lthough it appears no
     California cases has discussed at length what constitutes an 'antagonistic defense,'
5    the federal courts have almost uniformly construed that doctrine very narrowly.
     Thus, '[a]ntagonistic defenses do not per se require severance, even if the
6    defendants are hostile or attempt to cast blame on each other.' [Citation.] 'Rather,
     to obtain severance on the ground of conflicting defenses, it must be demonstrated
7    that the conflict is so prejudicial that [the] defenses are irreconcilable, and the
     jury will unjustifiably infer that this conflict alone demonstrates that both are
8    guilty.' [Citations.] Stated another way, '"mutual antagonism" only exists where
     the acceptance of one party's defense will preclude the acquittal of the other.'
9    [Citations.]" (Id. at p. 168.)

10   Shortly after Hardy was decided, the United States Supreme Court decided Zafiro
     v. United States (1993) 506 U.S. 534 [122 L.Ed.2d 317], which declined to adopt
11   a bright-line rule mandating severance whenever defenses are mutually
     antagonistic. (Id. at p. 538 [122 L.Ed.2d at p. 325].) Instead, Zafiro held that a
12   court "should grant a severance...only if there is a serious risk that a joint trial
     would compromise a specific trial right of one of the defendants, or prevent the
13   jury from making a reliable judgment about guilt or innocence." (Id. at p. 539
     [122 L.Ed.2d at p. 325].) Neither occurred in this case.
14
     Unlike United States v. Mayfield (9th Cir. 1999) 189 F.3d 895, on which
15   defendant relies, the joint trial in this case did not compromise the defendant's
     right to confront Anderson's evidence against him. (Id. at pp. 903-907.)
16
     Moreover, contrary to his argument, Anderson's "considerable evidence" about
17   defendant's "abusive, bullying tactics" would not have been "irrelevant" had
     defendant been tried separately. Rather, the evidence would have been relevant to
18   identify defendant as the person whose use of such tactics induced Anderson to
     assist him in the robbery and murder. (Evid. Code, § 210; People v. Scheid
19   (1997) 16 Cal.4th 1, 13-14; see Zafiro v. United States, supra, 506 U.S. at p. 540
     [122 L.Ed.2d at p. 326]["A defendant normally would not be entitled to exclude
20   the testimony of a former codefendant if the district court did sever their trials,
     and we see no reason why relevant and competent testimony would be prejudicial
21   merely because the witness is also a codefendant."].)

22   Defendant has not identified any other specific trial right that was violated by the
     denial of severance. Nor has he shown that the conflicting defenses would
23   prevent the jury from making a reliable judgment about guilt or innocence.
     (Zafiro v. United States, supra, 506 U.S. at p. 539 [122 L.Ed.2d at p. 325].) There
24   is no indication that the joint trial induced the jury to convict defendant without
     proof beyond a reasonable doubt. The jurors' inability to reach a verdict
25   regarding Anderson shows that they considered the evidence as to each defendant
     individually. (E.g., United States v. Pryba (4th Cir. 1990) 900 F.2d 748, 758;
26   United States v. Garner (7th Cir. 1987) 837 F.2d 1404, 1414; United States v.

1         Walker (11th Cir. 1983) 720 F.2d 1527, 1534.)

2         In any event, the refusal to order separate trials was harmless because "the evidence actually introduced at trial" reveals no "reasonable probability" defendant would have obtained a more favorable result at a separate trial. (People v. Greenberger, supra, 48 Cal.App.4th at p. 343; see People v. Bean (1988) 46 Cal.3d 919, 940; People v. Massie (1967) 66 Cal.2d 899, 922-923.)

        As the trial court properly discerned, the testimony of Vanessa H. and James M., and the "confluence of all the circumstantial evidence," created a compelling and strong case against defendant that would have existed "even absent" Anderson's testimony. There is no reasonable possibility that defendant could have overcome that evidence at a separate trial. (People v. Greenberger, supra, 58 Cal.App.4th at p. 343.)

        Defendant disagrees, claiming "all of the incriminating evidence implicating [him] comes from the mouths of two persons, co-defendants Anderson and [James M.]," who could have conspired with "some unknown third person whom they had decided to protect." Defendant is incorrect.

        The most compelling evidence identifying defendant as the coparticipant of Anderson and James M. came from Vanessa H., who testified that *defendant* told her to go inside after just 30 minutes, that *defendant* was in the driver's seat of the stolen car, and that *defendant* called the children into the bedroom and "said if we said anything...that he would hurt us or kill us." Anderson's absence from the trial could not have adversely affected Vanessa's credibility. Defendant's defense did not provide an innocent explanation for Vanessa's observations, and his appellate briefing does not come to grips with them. He could not have fared better had his severance motion been granted.

Respondent's Lodged Document 1, pp. 13-22.

        A court may grant habeas relief on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial. Zafiro v. United States, 506 U.S. 534, 538-39, 113 S.Ct. 933 (1993); United States v. Lane, 474 U.S. 438, 446 n. 8, 106 S.Ct. 725 (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"). Petitioner bears the burden of demonstrating that the denial of severance rendered his trial fundamentally unfair, Grisby v. Blodgett, 130 F.3d 365, 370 (9th 1997) and must establish that prejudice arising from the failure to sever was so "clear, manifest, and undue" that he was denied a fair trial. Lambright v. Stewart, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting United States v. Throckmorton, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).

13

1        Petitioner argues that he was prejudiced by Anderson's considerable evidence,
2 presented through cross-examination and direct evidence, about petitioner's bullying, abusive
3 tactics. Petitioner argues that this evidence would have been irrelevant had he been tried alone.
4 Petitioner also observes that the jury could not reach a verdict as to Anderson. Petitioner argues
5 that these circumstances demonstrate that petitioner's conviction was more a result of
6 Anderson's success in defending himself than a product of the state's constitutional duty to prove
7 his guilt beyond a reasonable doubt.

8        Petitioner further argues that his alibi defense became clouded by all of the other
9 credibility determinations presented via Anderson's defense. Petitioner argues that without the
10 corroborating effect of Anderson's testimony to undermine the alibi defense, the jury very
11 probably would have entered sufficient doubt about McCune's incriminating testimony in
12 comparison to the alibi defense. Petitioner argues that McCune's testimony suggested that he
13 was implicating petitioner in order to protect the person who actually joined him and Anderson in
14 robbing the market.

15        Petitioner concedes that though Anderson's testimony would have been
16 admissible against petitioner in a separate trial, this assumption presupposes that Anderson
17 would have been tried first if the trial had been severed. If not, then Anderson would have very
18 likely asserted his Fifth Amendment right and refused to testify. Petitioner goes on to argue that
19 if Anderson had been tried and convicted first, he would have realized that he had nothing to gain
20 by continuing to falsely insist that petitioner was involved in the robbery, and may have
21 implicated the actual third participant.

22        This court acknowledges that the defenses of petitioner and his co-defendant
23 Anderson were mutually antagonistic. As discussed above, petitioner presented an alibi defense
24 in support of claim that he was not involved in the robbery. In contrast, Anderson admitted both
25 the involvement of himself and petitioner in the robbery, but argued that petitioner had coerced
26 him to participate. The jury's acceptance of Anderson's defense precluded the acquittal of

petitioner. If prejudice were not a component of the constitutional violation, petitioner might have a point under United States v. Mayfield, 189 F.3d 895 (9th Cir. 1989). Nevertheless, for the reasons discussed below, petitioner has not demonstrated that the trial court's failure to sever his trial from Anderson's caused him to suffer prejudice that was "clear, manifest and undue."

The evidence not connected to the Anderson defense that petitioner was a participant in the robbery was quite strong. In particular, as discussed by the state appellate court, Vanessa H., who was 13 at the time of the incident, testified that on October 22, 1998, she saw petitioner, Anderson, James McCune and Nevada Bables in a bedroom of the house together talking. RT at 475. Around 7:00 p.m., she saw these four people leave the house in petitioner's car. RT 477. They told Vanessa to go back into the house 30 minutes after they left. RT at 477. When interviewed by a detective after the incident, Vanessa stated that these four later returned in a car other than petitioner's. RT at 479-480. At around midnight that night, petitioner and Anderson came into the house. RT at 482. Petitioner called her into a room and told her that if she said anything, he would kill or hurt her. RT at 483.

The next day, Vanessa was sitting on the car in the driveway with petitioner, Anderson and Bables. RT at 484. Anderson told her that "they" had robbed Bill's Market. RT at 485. When interviewed by a detective after the incident, Vanessa stated that Anderson told her that he, petitioner and McCune had robbed the market. RT at 485-486. Of course, Vanessa's testimony regarding the participants of the robbery was corroborated by McCune.

In addition, petitioner was filmed cashing the stolen tickets and petitioner's fingerprint was found on one of the cashed lottery tickets.[1] Petitioner "fled" to Arkansas after the robbery. Finally, petitioner's blurted out statement describing what took place at the robbery is very adverse to petitioner. All of these facts, which would have been admissible had petitioner been separately tried, are strong evidence of his involvement in the robbery and murder. Had

---

[1] Petitioner's explanation that he found a bag of uncashed lottery tickets on the road is laughable.

15

petitioner been tried separately from Anderson, there would have been sufficient evidence linking him to the robbery and murder.

Had petitioner been tried separately, it is possible that Anderson could have testified against him as to petitioner's involvement in the crimes, and as to his abusive and bullying tactics. This would have been additional evidence of his involvement in the robbery and murder. In any event, had petitioner been tried separately and Anderson did not testify, for the reasons discussed above, there was still strong evidence of petitioner's guilt. The outcome of the trial would not have changed.

This court also agrees with the trial court's assessment of petitioner's alibi defense. The alibi defense, presented through petitioner's brother, contradicted the testimony of Vanessa H., whose testimony corroborated that of James McCune regarding who participated in the robbery. Vanessa H.'s testimony was more credible than that of petitioner's brother, who had an obvious stake in the outcome of the trial. It is very unlikely that the jury would have chosen to believe petitioner's brother over Vanessa H. had it not heard the evidence presented in support of Anderson's defense.

For the reasons discussed above, the court does not find petitioner was prejudiced by the trial court's denial of his motion to sever so as to deny his Fifth Amendment right to a fair trial. Had the jury not heard Anderson's defense evidence, petitioner would still have been convicted because of the strong evidence against him independent of the Anderson defense evidence.

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's claim alleging that the trial court violated his right to a fair trial by denying his motion to sever be denied, and judgment be entered.

1  These findings and recommendations are submitted to the United States District
2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
3  days after being served with these findings and recommendations, any party may file written
4  objections with the court and serve a copy on all parties.  Such a document should be captioned
5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
6  shall be served and filed within ten days after service of the objections.  The parties are advised
7  that failure to file objections within the specified time may waive the right to appeal the District
8  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 12/7/07

/s/ Gregory G. Hollows
_____
UNITED STATES MAGISTRATE JUDGE

coll1516.157