IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHNNY PAUL COLLINS,

        Petitioner,

  vs.

DAVID L. RUNNELS, et al.,

        Respondents.

Case No. 2:04-cv-01516 JKS GGH P

ORDER

     Petitioner, a state prisoner represented by counsel, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He seeks to challenge his 2000 convictions for second degree robbery and first degree murder.  He alleges relief is warranted on the grounds that the trial court denied his constitutional right to a fair trial by denying his motion to sever his trial from that of his codefendant where their defenses were mutually exclusive.  The matter was referred to the Honorable Gregory G. Hollows, United States Magistrate Judge.  Judge Hollows recommends Petitioner's application be denied.  This Court concurs in the recommendation as there appears to be no clearly established federal law binding on the states regarding severance where codefendants present mutually exclusive defenses.

## I - BACKGROUND

     On October 22, 1998, Robert Yee and his wife, Sim, were robbed while closing up their market in Rio Linda, California.  Mrs. Yee, who suffered from impaired lungs and an enlarged heart, died, likely because she could not breathe effectively having been tied up and placed face

1

down with duct tape across her mouth.  *See* Reporter's Transcript ("RT") at 449-50.  Investigators identified Petitioner, Shaun Anderson and James M. as the suspected robbers.[1]  James M. confessed to the robbery and agreed to testify against the others in exchange for a deal that permitted him to plead guilty to murder as a juvenile.  RT at 316.

Petitioner and Anderson were jointly charged with robbery and the first degree murder of Sim Yee.  Clerk's Transcript ("CT") at 18-19.  It became evident before the trial that Petitioner and Anderson intended to advance mutually antagonistic defenses.  *See* RT at 3-4.  Petitioner planned to present an alibi defense with evidence that he was on the phone with his brother during the time of the robbery.  *Id*.  Anderson intended to present a defense of duress with evidence that Petitioner coerced him and James M. into participating with Petitioner in the robbery.  *Id*.  The trial court recognized the existence of antagonism, but found that the defenses were not so antagonistic as to render a joint trial inherently unfair, especially in light of the policy preferences underlying joint trials.  RT at 55-56.

The prosecution called 14 witnesses, including James M., who confessed to participating with Petitioner in the planning and execution of the robbery.  At the conclusion of the prosecution's case-in-chief, Anderson testified on his own behalf, essentially corroborating James M.'s testimony regarding Petitioner's involvement.  Despite the incriminating testimony of both James M. and Anderson, Petitioner presented his alibi defense.

In an opinion filed on January 13, 2003, the California Court of Appeal for the Third Appellate District summarized the evidence presented at Petitioner's trial.  After an independent review of the transcript of trial, the Court adopts the factual summary as its own:

---

[1] At some point, investigators also began to suspect that Petitioner's girlfriend Nevada Bables had been involved.  Bables was called as a witness for Shaun Anderson, but she invoked her Fifth Amendment privilege and refused to testify.  RT 798-800.  After Petitioner's trial, Bables was charged with several counts relating to her participation in the robbery.  She eventually pled no contest to one count of robbery and one count of aiding a principal in a felony after the fact.  *See People v. Bables*, No. F03212 (Cal. Sup. Ct. Sacramento County, June 15, 2000).

*Prosecution case-in-chief*

On October 22, 1998, at about 7:00 p.m., Robert Yee and his wife, Sim, were closing Bill's Market in Rio Linda, the business they had owned for 37 years. The Yees lived next door to the market. At around 7:15, as Mr. Yee was boarding the front door, three robbers (defendant, Anderson, and James M.) wearing ski masks pushed him into the store. Defendant carried a .38-caliber pistol. He and Anderson forced Mr. Yee into the back of the store while James M. went to the cash register area where Mrs. Yee was standing behind the counter.

Defendant and Anderson forced Mr. Yee to lie down; taped his hands, mouth, and feet with duct tape; and hit him on the head with a heavy object. Anderson kicked Mr. Yee in the head. Defendant took Mr. Yee's ring and $60 from his wallet. Defendant obtained Mr. Yee's house keys. He and Anderson went to the residence.

Mr. Yee was on the floor for 10 to 15 minutes. He struggled to free himself from the duct tape. At about the time he had worked himself free, he heard his across-the-street neighbor, Steven Parrish, call for him.

Mr. Parrish testified that at about 7:15 p.m., as he and a companion were standing on his front porch, he observed lights at Bill's Market. Mr. Parrish was concerned, because he knew the market normally was closed at that time. As he watched, he saw three or four "tall people" come out of the store, sneak around the side of the building, jump into a little dark sedan, and rush off in the direction of a local elementary school. [Footnote 2] Mr. Parrish ran across the street and found Mrs. Yee laying face down on the floor, behind the counter, bound with duct tape. Mr. Parrish heard movement in the back room and called out for Mr. Yee, who ran into the front of the store after freeing himself from the tape. Mr. Parrish and Mr. Yee then ran back to Mrs. Yee, who was not moving or breathing. Mr. Yee, who was "real distraught," started ripping all the tape off of Mrs. Yee and hollering at her. The robbers had disabled the store's telephones by pulling out their wires. Mr. Parrish's companion

> [Footnote 2: A stolen blue 1987 Mazda sedan was found abandoned at the school. The car had been stolen from Carmichael the night before the robbery.]

returned to his house and telephoned 911. Mr. Parrish spoke to Mrs. Yee but got no response. He was unable to feel a pulse.

The robbers emptied the cash register of money, money orders, and lottery tickets. Pieces of duct tape were found near Mrs. Yee's body. The Yees' house was ransacked; a mattress had been moved, and dresser drawers had been opened. The telephones were broken.

Dr. Robert Anthony performed an autopsy on Mrs. Yee. She had lost a fair amount of lung tissue, caused by the autoimmune disease scleroderma. The impaired lungs stressed and enlarged her heart. Her lung disease had reached a plateau and stabilized, and she had begun the occasional use of oxygen. Dr. Anthony and Mrs. Yee's attending physician both testified that she would have been at great risk of death by being unable to breathe, if she had been placed face down on the floor, or had her mouth covered with duct tape. Dr. Anthony opined that Mrs. Yee's death may have been caused by positional asphyxia, in which being placed prone prevented her from breathing effectively.

Steven Parrish's next-door neighbors were members of the Bables and Crawley families: Nevada Bables and her children, James M., Jennifer M. and Tiffany M.; Nevada Bables's sister and brother-in-law, Chris Bables Crawley and James Crawley;

3

Chris Crawley's son, Ivan, and her niece, Vanessa H.; James Crawley's cousin, defendant; and the son of some neighbors, Shaun Anderson. Anderson, defendant, and James M. were in a clique together called "Thug Life."

One to two weeks before the robbery of Bill's Market, Anderson, defendant, Marcus McGuire, and Jonathan Prentice were talking about robbing the market. McGuire was to be the getaway driver, but he dropped out before the plan was executed.

Later Anderson, defendant, James M., and Bables discussed a plan to wear disguises and to tie up the Yees with duct tape. They purchased grease paint, gloves, and black ski masks from Target.

The night before the robbery, defendant had separate conversations in his bedroom with Anderson and James M. Defendant had a .38 in his hand, but he did not threaten James M. with it.

On the afternoon of October 22, 1998, Anderson, Bables, and defendant picked up James M. and went home to discuss the plan further. They went to Target to buy duct tape, and then picked up a Mazda 626 that Anderson or defendant had previously stolen as part of the plan.

About a half hour before dark, while James M.'s sister Tiffany and his cousin Vanessa were riding bicycles, Vanessa saw Anderson, Bables, defendant, and James M. leave the house in defendant's car and drive toward the market. Before the foursome left, defendant told the girls to go into the house after 30 minutes, even though Vanessa usually stayed outside until 8:00 or 9:00 p.m. The girls went inside their house 20 to 25 minutes later when it was getting dark.

While Anderson, defendant, and James M. drove off in the stolen car, Bables drove defendant's car to the elementary school. Anderson, defendant, and James M. drove around until it got dark at about 7:00 p.m., waiting for people to clear out of the market. Vanessa observed defendant in the driver's seat and Anderson and James M. elsewhere in the car.

Around 7:00 p.m., defendant parked the stolen car on the side of the market. Anderson testified that, just before entering the market, defendant "said that we could get out of the robbery now, but we'd be accomplices." Anderson felt he had no choice because he was afraid of defendant. Defendant told James M. that he could not back out of the plan because he was already involved as an accessory. Defendant threatened to kill James M. if he told anyone else about the robbery.

Anderson, defendant, and James M. entered the store; James M. locked the door. Mrs. Yee was at the counter; Mr. Yee was in the back of the store. Defendant pointed a .38 at the Yees. He told Mrs. Yee to "get on the ground before he kill her [*sic*]." After James M. pulled the wires from the store's telephones, the robbers taped up the Yees, putting tape across their mouths, tying their feet together, and taping their hands behind their backs. Mrs. Yee was placed on her chest face down on the floor.

Anderson, defendant, and James M. each grabbed money from cash registers, drawers, boxes, and anywhere else they could find it. Someone took lottery tickets. Defendant took a ring from Mr. Yee while James M. took cigarettes. James M. heard defendant ask Mr. Yee for his keys. Anderson and defendant then entered the house. Anderson testified that he took the tape off Mrs. Yee's mouth before following defendant to the house.

4

Upon returning to the store, defendant and Anderson grabbed some cigarettes. The robbers returned to the stolen car and drove to the elementary school where Bables was waiting for them in defendant's car. They transferred everything from the stolen car to defendant's car and drove to a Kmart in Antelope, where they began scratching lottery tickets. While doing so, they agreed to say that they had found the tickets on the side of a road and that they had given them to Bables to cash in. After driving to various stores cashing winning tickets, they divided the proceeds equally. James M.'s share was close to $100.

After cashing the tickets, the foursome telephoned James M.'s uncle from a store to find out what was going on at the market. He told them that Mrs. Yee had died, but they did not believe him. The uncle met the foursome at the store and drove defendant home so that their arrival as a group "wouldn't look suspicious." Bables drove Anderson and James M. home.

Upon returning, James M. saw police cars at the market. Anderson, defendant, and James M. discussed how to keep the children in the household quiet. They called Vanessa and the other children into Bable's bedroom one at a time, and defendant told them he would hurt or kill them if they said anything.

About a week after the robbery, defendant told McGuire that, if any detectives questioned him, McGuire was to provide an alibi for James M. by saying that James was at McGuire's house with McGuire on the night of the robbery, and that McGuire later dropped off James M. at a gas station. McGuire agreed to do so because defendant had threatened him and McGuire feared retaliation if he did not provide the alibi. McGuire initially told detectives the false alibi, but a month later he told them that James M. was not with him and that he, McGuire, did not know what happened.

Using a computer tracking system, an agent for the California State Lottery identified nine retailers who redeemed lottery tickets originating from Bill's Market. The agent obtained videotapes from five of the retailers depicting a customer at the stores' counters when tickets were being cashed. The tapes depicted defendant or Bables cashing tickets. About $90 was paid out for the tickets. Some of the cashed tickets were recovered; one ticket bore the fingerprint of defendant.

At trial, Anderson admitted participating in the robbery but claimed defendant had coerced him into doing so by putting a gun to his head and threatening to kill him if he did not cooperate. Defendant planned the robbery because he needed money from the store "to get back to Arkansas to see [his] kids for Christmas." Defendant set a date for the robbery but changed it four or five times in a three-week period. Anderson did not take the plan seriously because it would be stupid to rob a store in their own neighborhood. Anderson claimed that, the day before the robbery, defendant threw him onto the ground, put a gun to his head, and threatened to kill him if he did not participate in the robbery.

Five days after the robbery, detectives contacted defendant and Bables after she acknowledged that she was one of the persons depicted in a photograph released to the media that showed her cashing stolen lottery tickets. In a search of Bables's bedroom, police found the shirt defendant had worn when cashing some stolen tickets. Police also found his .38 handgun in his car.

Following the search, defendant gave a videotaped statement. Defendant said that he, Anderson, and Bables left their residence at 7:00 p.m. and drove to the Food Outlet on Watt Avenue. He had a wife and children in Arkansas, but he was romantically involved with Bables. En route to the store, he and Bables got into an argument and decided to drive home. As they neared 28th and Elkhorn, they noticed a bag containing lottery tickets in the median. He made a U-turn and retrieved the bag.

5

They then went home so Bables could change her clothes and go back out to cash the tickets.

Two days later, defendant contacted detectives and told them he had not been truthful regarding Bables's son, James M. Defendant explained that he, Anderson, and Bables had a chance meeting with James M., McGuire, and Prentice at a gas station on Watt Avenue, and James was with Anderson, Bables, and defendant the rest of the night as they cashed tickets. During his interviews, defendant never claimed he was at home on the telephone at the time of the robbery.

On November 10, 1998, a detective attempted to arrest defendant for possession of stolen lottery tickets but was unable to locate him. The detective then began trying to find him in Arkansas. A sheriff's investigator in Arkansas located defendant and took him into custody in January 1999. Defendant, Johnny Paul Collins, had in his possession a birth certificate, a social security card, an Arkansas identification card, and an Arkansas Department of Health card, all in the name of Michael Joseph Collins and all issued on January 4, 1999.

During his extradition hearing, defendant was overheard to blurt out in a loud voice that he "did not murder that woman, that there was three of them. And that they had only tied the woman up and that she was on oxygen and he did not kill her."

*Defense*

At about 7:13 or 7:14 p.m. Pacific Standard Time on the day before the robbery defendant's wife, Catherine, made a 29-minute telephone call from the family home in Arkansas to defendant's residence.

At 7:10 p.m. Pacific Standard Time the day of the robbery, defendant's brother, Joey, made a telephone call from the family home in Arkansas to defendant's residence. This call, too, lasted 29 minutes. Defendant spoke with Joey for about 10 minutes, and then asked to speak to Catherine; he and Catherine conversed for 15 to 17 minutes. Joey decided to obtain his telephone records after defendant telephoned him from jail and said that he, defendant, remembered that Joey "was on the phone" on the day of the robbery. Joey had no knowledge of the robbery and no prearrangement to telephone defendant at that particular time. No one asked him to help create an alibi for defendant.

Defendant testified that, before coming to California in September 1998, he was having marital problems and believed Catherine was cheating on him. He drove to his cousin James Crawley's house in Rio Linda, where he stayed until the day of the robbery.

Defendant claimed he never discussed or planned a robbery, never threatened to kill Anderson if Anderson did not do as told, and did not ask McGuire to provide an alibi for anyone.

Defendant testified he was at Bables's house on the day of the robbery. He was in James Crawley's bedroom from about 3:30 or 4:00 p.m. until around 8:00 p.m. He received a telephone call from his brother, Joey, around 7:00 or 7:10 that evening. He talked first to Joey and then to Catherine. The entire call lasted about 30 minutes.

Defendant left the house with Anderson and Bables at about 8:00 p.m.; however, his wristwatch indicated approximately 7:00 p.m., because he had set it back one hour in anticipation of Pacific Standard Time, which commenced in three more days. It was dark outside, and defendant did not notice any police cars at Bill's Market, which was about 250 feet away. The three drove to the Food Outlet, traveling on

Elkhorn Boulevard. Defendant and Bables argued in the car for about 30 minutes and then defendant began driving back to the house.

As defendant drove, Anderson noticed something in the road. Defendant made a U-turn, reached down and picked up the item, which was a plastic bag full of unused lottery tickets. They returned to the house so Bables could change into warmer clothing, and then went back out to cash the tickets. At that point they saw patrol cars at the market. Although defendant assumed the lottery tickets were probably stolen, he did not think they were connected to anything occurring at the market. After scratching the tickets and finding the winners, they traveled to several stores to cash the tickets a few at a time. They ended up with about $70 or $80 and returned home at around midnight or 1:00 a.m.

Defendant acknowledged that he returned to Arkansas after telling a detective he would remain in California until the matter was resolved. He also acknowledged obtaining pieces of false identification after learning he was wanted for armed robbery and capital murder.

Defendant acknowledged that, although detectives and Agent Lewandowski questioned him, he never mentioned that he was at home speaking on the telephone at the time of the robbery and murder. Defendant denied that he was in a stolen car on the night of the robbery; that he had anything to do with stealing the car; and that he had anything to do with Bables driving his car to the elementary school.

*Rebuttal*

Agent Lewandowski testified that, when defendant spoke to him on October 29, 1998, defendant stated he left Bables's house at approximately 7:00 p.m. Defendant said he "drove to the Food Outlet store located at the corner of Watt Avenue and Elkhorn Boulevard" and that he stayed in the Food Outlet parking lot for 30 to 35 minutes. At that time, defendant did not discuss daylight savings time or setting his watch back to standard time. Defendant said he left the house a second time at approximately 8:00 p.m. and went to the 8100 block of Watt Avenue, where he parked in the Kmart shopping center.

Respondent's Lodged Document No. 1 at 2-13.

At the conclusion of the trial, the jury found Petitioner guilty of robbery and murder, but deadlocked on the identical charges against Anderson.[2] *Id*. at 1-2. Petitioner moved for a new trial based on the failure to sever. *See* RT 1636-43. RT 1641-43. The trial court denied the motion, again rejecting Petitioner's arguments regarding severance:

The court had previously denied the pretrial Motion to Sever made on behalf of Mr. Collins. [¶] I considered the arguments regarding antagonistic defense and potential prejudice as Mr. Collins in a joint trial. [¶] The Court considered that offer as presented by the Defense at the time, as well as the case law regarding this matter and the preference for joint trials. [¶] The Court feels that the policy reasons supporting joint trial very much existed in this case which is to allow the jury, the finders of fact and finders of the truth, to have, hopefully, a full and more meaningful opportunity to review all the evidence. [¶] The fact that Mr. Collins and Mr.

---

[2]Anderson was later convicted at retrial. *See People v. Anderson*, No. C036064, available at 2003 Cal. App. Unpub. LEXIS 354 (Cal. Ct. App. January 13, 2003).

7

Anderson had some conflicting positionss [sic] regarding their Defenses, is true. But is also the fact that the jury is in a better position to [ferret-out] the true circumstances as they are presented with an understanding of the -- fuller understanding of the facts. [¶] It's also true that a fair number of the factual relationship between Mr. Collins and Mr. Anderson was, in fact, not presented to the Jury. The Court did not allow them to hear quite a bit about -- actually, really anything about the prior criminal activities together which amounted to prior robberies and prior car thefts and other theft-related crimes. That was all very carefully excised and not presented to the jury so has [sic] to prejudice Mr. Collins or Mr. Anderson.

After considering the evidence that was presented, in the Court's view, there was nothing that transpired during the trial that made the Court regret it's pretrial ruling in this matter. [¶] The presentation of the respective defenses was as anticipated. But I do not feel Mr. Collins was prejudiced by the presentation of evidence. [¶] I feel that the evidence that was presented in this trial, largely would have been presented in an independent trial against Mr. Collins as stated by Ms. Koller. [¶] In this case, [James M.], in the Court's view, is compelling and quite credible witnesses [sic] while under the circumstances. While he was certainly an accomplice -- an admitted accomplice in the crime, he was offered some degree of leniency. [¶] In the Court's view, he testified credibly. And his testimony was amply corroborated by a number of other circumstantial evidence that was offered up by the People. [¶] In other words, I guess what I'm trying to get at: Between the testimony of [Vanessa H.]; the testimony of [James M.]; and the confluence of all the circumstantial evidence, in the Court's view this was a compelling and strong case for the People against Mr. Collins, and would have been even absent Mr. Anderson's testimony, and absent Mr. Anderson's assertion that Mr. Collins was a bullier, and Mr. Collins pressured him to do the crime. [¶] It's quite clear from [James M.'s] testimony that Mr. Collins was the instigator and one of the prime movers, and the other two were very much involved as well -- but that's not before me.
Oh, I also wanted to comment on the alibi. I heard the alibi witness and teh [sic] alibi defense offered. And certainly Mr. Collins is entitled to present such defense at his trial. But it was, in the Court's view, that his brother, Mr. Joey Collins, was unbelievable in my view in light of all the other evidence that was being offered in the case. [¶] Therefore, I find that there was no prejudice whatsoever by the trying of these cases jointly, and deny the Motion for New Trial on that basis.

RT at 1641-43.

Petitioner appealed his conviction, arguing, *inter alia*, that he was prejudiced by the joint trial. Lodged Document A (Petitioner's opening brief). The California Court of Appeal examined the issue at length:

"Section 1098 provides: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials . . . .' In *People v. Boyde* (1988) 46 Cal.3d 212, 331-323 [250 Cal. Rptr. 83, 758 P2d 25] the Supreme Court recognized that this section was the Legislature's expression of preference for joint trials. 'The statute nevertheless permits the trial court to order separate trials, and the decision to do so is one "largely within the discretion of the trial court." [Citations.] Whether denial of a motion to sever constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion to sever.' (Ibid.)" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 343.)

"'After trial, of course, the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law.' [Citation.] The appellate court looks 'to the evidence actually introduced at trial' in making this latter determination. [Citation.] In such an analysis the Supreme Court has stated: 'We do not believe that we should reverse a conviction achieved at a joint trial in the absence of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial. Although we recognize the importance of the preservation of the procedural safeguard of a separate trial, the Legislature has decreed joint trials to be the rule and separate trials the exception. . . . We must weigh the prejudicial impact of all of the significant effects that may reasonably be assumed to have stemmed from the erroneous denial of a separate trial.' [Citation.]" (*People v. Greenberger*, *supra*, 58 Cal.App.4th at p. 343.)

"The Supreme Court has characterized a trial in which the defendants are charged with common crimes against common victims as the classic situation for joint trials. [Citations.] In [*People v. Turner* (1984) 37 Cal.3d 302] the defendant argued that his defense would conflict with that of the codefendant, allowing the People to sit back and watch the defendants become adversaries. The court observed that ' . . . if that point has merit, separate trials would appear to be mandatory in almost every case.' [Citation.] The court in *People v. Boyde*, *supra*, 46 Cal.3d 212, 232 observed: 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, none has found an abuse of discretion or reversed a conviction on this basis.'

The Supreme Court, recognizing that few California cases have discussed what constitutes an 'antagonistic defense,' referred to federal authority and concluded that the concept is construed very narrowly. [*People v. Hardy* (1992) 2 Cal.4th 86, 168.]" (*People v. Greenberger*, *supra*, 58 Cal.App.4th at p. 344.)

*People v. Hardy*, *supra*, 2 Cal.4th 86 explained, "[A]lthough it appears no California case has discussed at length what constitutes an 'antagonistic defense,' the federal courts have almost uniformly construed that doctrine very narrowly. Thus, '[a]ntagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.] 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' [Citations.] Stated another way, '"mutual antagonism" only exists where the acceptance of one party's defense will preclude the acquittal of the other.' [Citations.]" (*Id*. at p. 168.)

Shortly after *Hardy* was decided, the United States Supreme Court decided *Zafiro v. United States* (1993) 506 U.S. 534 [122 L.Ed.2d 317], which declined to adopt a bright-line rule mandating severance whenever defenses are mutually antagonistic. (*Id*. at p. 538 [122 L.Ed.2d at p. 325.) Instead, *Zafiro* held that a court "should grant a severance . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." (*Id*. at p. 539 [122 LEd.2d at p. 325].) Neither occurred in this case.

Unlike *United States v. Mayfield* (9th Cir. 1999) 189 F.3d 895, on which defendant relies, the joint trial in this case did not compromise defendant's right to confront Anderson's evidence against him. (Id. at pp. 903-907.)

Moreover, contrary to his argument, Anderson's "considerable evidence" about defendant's "abusive, bullying tactics" would not have been "irrelevant" had defendant been tried separately. Rather, the evidence would have been relevant to identify defendant as the person whose use of such tactics induced Anderson to assist

9

> him in the robbery and murder. (Evid. Code, § 210; *People v. Scheid* (1997) 16 Cal.4th 1, 13-14; see *Zafiro v. United States*, supra, 506 U.S. at p. 540 [122 L.Ed.2d at p. 326] ["A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials, and we see no reasons why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant."].)
>
> Defendant has not identified any other specific trial right that was violated by the denial of severance. Nor has he shown that the conflicting defenses would prevent the jury from making a reliable judgment about guilt or innocence. (*Zafiro v. United States*, supra, 506 U.S. at p. 539 [122 L.Ed.2d at p. 325].) There is no indication that the joint trial induced the jury to convict defendant without proof beyond a reasonable doubt. The jurors' inability to reach a verdict regarding Anderson shows that they considered the evidence as to each defendant individually. (E.g., *United States v. Pryba* (4th Cir. 1990) 900 F.2d 748, 758; *United States v. Garner* (7th Cir. 1987) 837 F.2d 1404, 1414; *United States v. Walker* (11th Cir. 1983) 720 F.2d 1527, 1534.)
>
> In any event, the refusal to order separate trials was harmless because "the evidence actually introduced at trial" reveals no "reasonable probability" defendant would have obtained a more favorable result at a separate trial. *(People v. Greenberger*, supra, 58 Cal.App.4th at p. 343; see *People v. Bean* (1988) 46 Cal.3d 919, 940; *People v. Massie* (1967) 66 Cal.2d 899, 922-923.)
>
> As the trial court properly discerned, the testimony of Vanessa H. and James M., and the "confluence of all the circumstantial evidence," created a compelling and strong case against defendant that would have existed "even absent" Anderson's testimony. There is no reasonable possibility that defendant could have overcome that evidence at a separate trial. (*People v. Greenberger*, supra, 58 Cal.App.4th at p. 343.)
>
> Defendant disagrees, claiming "all of the incriminating evidence implicating [him] comes from the mouths of two persons, co-defendants Anderson and [James M.]," who could have conspired with "some unknown third person whom they had decided to protect." Defendant is incorrect.
>
> The most compelling evidence identifying defendant as the coparticipant of Anderson and James M. came from Vanessa H., who testified that *defendant* told her to go inside after just 30 minutes, that *defendant* was in the driver's seat of the stolen car, and that *defendant* called the children into the bedroom and "said if we said anything . . . that he would hurt us or kill us." Anderson's absence from the trial could not have adversely affected Vanessa's credibility. Defendant's defense did not provide an innocent explanation for Vanessa's observations, and his appellate briefing does not come to grips with them. He could not have fared any better had his severance motion been granted.

Lodged Document No. 1 at 17-22 (all citations, quotation marks and modifications in the original). The court accordingly affirmed Petitioner's conviction. *Id*. at 22. The California Supreme Court summarily denied review. Lodged Document No. 3 (*People v. Collins*, No. S113535 (Cal. March 19, 2003)).

In August 2003, Petitioner sought a writ of habeas corpus from the California Supreme Court, again arguing that the failure to sever the trials violated his right to due process. *See* Lodged Document No. 4 (Petitioner's brief). The petition was summarily denied on May 12, 2004. Lodged

10

Document No. 5 *(In re Johnny Collins*, S118230 (Cal. May 12, 2004)).  Three months later, Petitioner timely commenced the current case in federal court.  Docket No. 1.  Now before the Court is Petitioner's First Amended Petition.  *See* Docket No. 15.

## II - LEGAL STANDARD

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  *See Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  A federal writ is not available for an alleged error in the interpretation or application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149-50 (9th Cir. 2000); *Middleton*, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues *de novo*.  *Milton v. Wainwright*, 407 U.S. 371, 377 (1972).

Because Petitioner filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).  Where a state court has adjudicated the merits of a petitioner's claim, this Court, under AEDPA, may not grant relief unless the state court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000).  Clearly established federal law refers only to the holdings of the Supreme Court's decisions in effect at the time of the relevant state-court decision.  *Carey v. Musladin*, 459 U.S. 70, ___, 127 S. Ct. 649, 653 (2006).  In the absence of an applicable holding of the Supreme Court, it cannot be said that a state court decision is contrary to or an unreasonable application of clearly established federal law.  *See id*. at 654.  Finally, even if the AEDPA standard is satisfied, the Court cannot grant relief unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *Fry v. Pliler*, 127 S. Ct. 2321, 2326-27 (2007) (*Brecht* standard continues to apply after enactment of AEDPA).

A federal district court looks to the last reasoned state court decision as the basis for the state court judgment. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). In this case, the last reasoned decision was rendered by the California Court of Appeal on January 13, 2003.

### III - DISCUSSION

a.

The Supreme Court has noted that misjoinder results in a constitutional violation only when it results "in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). Petitioner alleges that the failure to sever denied him a fair trial because he and his codefendant presented mutually exclusive defenses, preventing the jury from considering the guilt of each defendant separately, and allowing otherwise inadmissible evidence of his prior violent acts to be presented to the jury. In this case, the state court held that the trial court did not abuse its discretion as the joint trial neither denied Petitioner his right to confront Anderson's evidence nor prevented the jury from making a reliable judgment about guilt or innocence. Lodged Document No. 1 at 19-20. Moreover, the state court found that even if the trials should have been severed, the error was harmless in light of the overwhelming evidence of Petitioner's guilt. *Id*. at 21. This Court must decide whether those holdings were contrary to or an unreasonable application of clearly established federal law.

This case does not present an appeal from a decision of a federal district court applying Federal Rules of Criminal Procedure 8 (joinder) and 14 (severance). Rather, this case presents a California trial court's decision to deny severance based on California Penal Code § 1098. Under AEDPA, the Court may not grant Petitioner relief unless it can identify one or more holdings of the United States Supreme Court that announce a constitutional rule binding on the states regarding severance. *See Carey*, 127 S. Ct. at 653-54. The Court has found none.

There are clearly a few analogous Supreme Court cases dealing with the confrontation clause or the Federal Rules of Criminal Procedure. In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that criminal defendants are deprived of their Sixth Amendment right to confront witnesses when a non-testifying codefendant's statement is admitted against them. *Bruton*, 391 U.S. at 126. That is not the case here, as Anderson testified at the joint-trial and was subject to cross-examination by Petitioner. RT 926 - 1112; *see also Zafiro v. United States*, 506 U.S. 534, 540

12

(1993) ("we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant").

In *United States v. Lane*, *supra*, the Supreme Court held that "an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Lane*, 474 U.S. at 449. In dicta, the Court noted that "misjoinder would rise to the level of a constitutional violation only if it result[ed] in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id*. at 446 n.8. However, the holding itself did not implicate the constitution, but rather embodied the Court's reconciliation of Rules 8 and 52. *See id.* at 446, 449. As *Lane* did not announce a constitutional rule binding on the states, it cannot be considered clearly established federal law applicable to this case. *See Carey*, 127 S. Ct. at 653-54.

The closest case to the one at hand seems to be *Zafiro v. United States*. In *Zafiro*, the Supreme Court held that "[m]utually antagonistic defenses [were] not prejudicial *per se*," and that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 538-39. This holding squarely addresses the standard applicable to a federal district court's severance decision under Rule 14, but it does not portend to announce a constitutional standard applicable to the states. It is true that the California Court of Appeal treated *Zafiro* as persuasive. Lodged Document No. 1 at 19-20. However, it is apparent that the state court read *Zafiro* only as a persuasive aid to the interpretation of California's procedural rules regarding severance. *See id.* at 18-19. *Zafiro* too then fails to provide clearly established law applicable to the case at hand under AEDPA.

In essence, the effect of mutually exclusive defenses on due process is an open question in Supreme Court jurisprudence. In the absence of a holding of the Supreme Court governing the constitutional standard for severance, this Court cannot find that the California Court of Appeal's decision was contrary to or an unreasonable application of clearly established federal law. Petitioner's application accordingly fails under the onerous standard imposed by AEDPA.

b.

Before Petitioner can appeal the judgment, a Certificate of Appealability ("COA") must issue. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). "To obtain a COA under § 2253(c), a habeas

13

prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000) (internal quotation marks and citations omitted). The Court believes that reasonable jurists could debate whether this petition should have been resolved in a different manner.

Contrary to the discussion thus far, the Ninth Circuit has occasionally conflated the standards announced by *Zafiro* and *Lane* with constitutional standards applicable in a state prisoner's habeas proceeding. *See, e.g., Gomez v. Pliler*, 212 Fed. Appx. 687, 689 (9th Cir. 2006) (unpublished). If this Court were to follow suit, this would be a much closer case.

*Zafiro* squarely addressed *mutually antagonistic defenses* in the context of Rule 14, but the Supreme Court has never addressed the rarer case of *mutually exclusive* defenses. *See Zafiro*, 506 U.S. at 543 (Stevens J., concurring). Courts often mistakenly use these terms interchangeably:

> "Mutually antagonistic" defenses include all defenses that conflict, such that the jury's acceptance of one will make it harder for them to accept the other. "Mutually exclusive" and "irreconcilable" defenses represent an extreme subcategory of "mutually antagonistic" defenses: defenses that are truly irreconcilable, such that for the jury to believe and acquit one defendant, it must convict the other.

Scott Hamilton Dewey, *Irreconcilable Differences: The Ninth Circuit's Conflicting Case Law Regarding Mutually Exclusive Defenses of Criminal Codefendants*, 8 Boalt J. Crim. L. 2, 4 (2004) (hereinafter "Dewey"). These must be kept distinct because the potential for prejudice is much higher in the case of mutually exclusive or irreconcilable defenses. *See Zafiro*, 506 U.S. at 543 (Stevens J., concurring) ("joinder may well be highly prejudicial, particularly when the prosecutor's own case in chief is marginal and the decisive evidence of guilt is left to be provided by a codefendant").

The Ninth Circuit has developed a fairly ambiguous jurisprudence on the specific issue of mutually exclusive defenses. *See generally,* Dewey. In its first opportunity to address a case that actually presented mutually exclusive defenses, the court expressly declined to adopt a rule that mutually exclusive defenses are prejudicial *per se*. *United States v. Tootick*, 952 F.2d 1078, 1083 (9th Cir. 1991). Instead, the court held that "defendants must demonstrate that clear and manifest prejudice did in fact occur." *Id*. In case after case since *Tootick*, the court has complicated the issue by continuing to cite earlier dicta for the proposition that prejudice is established where a defendant

14

demonstrates that the core of his defense is irreconcilable with the core of his codefendant's defense, such that the jury cannot acquit one without finding the other guilty. *See United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996); *see also United States v. Mayfield*, 189 F.3d 895, 899 (9th Cir. 1999).[3] The *Throckmorton-Mayfield* line of cases notwithstanding, the holding in *Tootick* that clear and manifest prejudice must actually be shown remains good law as it has never been overruled en banc. *See Murray v. Cable NBC*, 86 F.3d 858, 860 (9th Cir. 1996) (only a panel sitting en banc can overrule existing precedent); *United States v. Camper*, 66 F.3d 229, 232 (9th Cir. 1995) (same). Thus, despite the confusion created by the conflicting authority, it seems a petitioner must still show that clear and manifest prejudice actually occurred in his trial.

Petitioner contends that the magistrate judge overlooked his argument that he was prejudiced by the joint trial because it: (1) helped the jury to disregard his alibi evidence and (2) allowed his codefendant to testify to prior bad acts that Petitioner alleges would not have been admissible in a separate trial. Contrary to Petitioner's assertions, the magistrate judge did not overlook Petitioner's alibi defense or the alleged prejudice to Petitioner from Anderson's testimony regarding Petitioner's abusive, bullying tactics. *See* Docket No. 51 at 14. Rather, the magistrate judge examined these instances of potential prejudice and concluded that they were harmless in light of the overwhelming evidence of Petitioner's guilt. *See id.* at 14-16. Accordingly, the magistrate judge found that the California Court of Appeal's denial of Petitioner's claim was not an unreasonable application of Supreme Court precedent.

The Court does not agree with the magistrate judge's finding that the defense strategies of Petitioner and his codefendant were mutually exclusive. *Id*. at 14-15. Anderson's testimony that Petitioner was at the scene and participated in the robbery was independent of his defense of coercion and clearly admissible. The core of Anderson's coercion defense could have been established without contradicting Petitioner's assertion that he was not present at the scene of the crime. However, the Court recognizes that this is a nuanced issue upon which reasonable jurists could disagree.

Further, even if the Court were convinced that the defenses were mutually exclusive and that the Ninth Circuit precedent applied under AEDPA, actual prejudice would still need to be shown

---

[3]For a full discussion of the rise of this split, *see* Dewey at 35-69.

under *Tootick*. This comports with the harmless error standard applicable to constitutional error on habeas review in general, and misjoinder under the federal rules specifically. *See Brecht*, 507 U.S. at 638 ("harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type"); *Lane*, 474 U.S. at 449 ("an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict'"). Thus, although mutually exclusive defenses present a greater risk of prejudice than defenses that are merely mutually antagonistic, the test is the same, actual prejudice.

This Court agrees with both the California Court of Appeal and the magistrate judge that Petitioner has not demonstrated actual prejudice in light of the overwhelming evidence against him. Even if the Court excludes everything presented on direct or solicited on cross-examination by Anderson, the evidence against Petitioner was overwhelming. James M., who admitted participating in the robbery, testified in detail about Petitioner's actions before, during and after the robbery. RT 286-317. Marcus McGuire, who dropped out of the criminal endeavor several weeks before it came to fruition, testified that Petitioner was involved in planning the robbery. RT 646-50. Vanessa H., Petitioner's 12-year-old cousin, testified that Petitioner left the house around 7:00 p.m. with James M., Anderson and Bables. RT 475-82. She identified Petitioner as the one who told her to go inside as they left.[4] Clerk's Supp. Transcript on Appeal ("CST") at 86. She said that Petitioner was driving the stolen car when they briefly returned around 7:45 p.m. CST at 87-90, 92-94, 97. She also testified that on the night of the robbery, Petitioner threatened to hurt her or kill her if she did not keep quiet. RT 483. Petitioner was recorded by surveillance cameras cashing some of the lottery tickets stolen from the market, and his fingerprint was found on one of the tickets. RT 627-33. After being interviewed by investigators, Petitioner fled to Arkansas, where he obtained false identification documents in order to avoid apprehension. *See* RT 573-86. Finally, two law enforcement officers from Arkansas testified that during his extradition hearing, Petitioner made a spontaneous statement to the effect that they had not murdered that woman, but had only tied her up and she was on oxygen. RT 579, 587-88.

---

[4]As Vanessa H.'s memory had dimmed by the time of trial, the prosecution augmented her testimony with a prior statement recorded by Detective Maulsby. RT 471-88; 735-41.

16

Given all this evidence, Petitioner simply would not have fared better in a separate trial. This is not the hypothetical case of irreconcilable defenses that worried Justice Stevens in *Zafiro*, where the prosecution's case was weak leaving the burden of proof effectively to the codefendant. *See Zafiro*, 506 U.S. at 543. In this case, the prosecution put forth overwhelming evidence of Petitioner's guilt; Anderson's testimony was simply waxing the proverbial lily. Further, the trial court specifically instructed the jury to consider Anderson's testimony regarding Petitioner's prior bad acts only as to Anderson's state of mind. RT 1113-14; *Zafiro*, 506 U.S. at 539 (a limiting instruction will often "suffice to cure any risk of prejudice"). Thus, even if *Lane* and *Zafiro* were to be considered clearly established federal law under AEDPA, this Court believes any error in this case was harmless. While it may have been preferable to have granted severance in this case, in light of the overwhelming evidence against Petitioner, the Court cannot say the decision of the California Court of Appeal is contrary to or an unreasonable application of clearly established federal law. However, given the sometimes conflation of *Zafiro* and *Lane* with a constitutional standard and the intra-circuit split noted above, and assuming for the sake of argument that the defenses were truly irreconcilable, the Court believes reasonable jurists could debate whether irreconcilable defenses establish prejudice *per se*. Accordingly, the Court will issue a Certificate of Appealability.

c.

As the Court cannot locate a holding of the Supreme Court announcing a constitutional standard for severance applicable to the states, Petitioner's application fails. The Court simply cannot say that the decision of the California Court of Appeal was contrary to or an unreasonable application of a holding that cannot be found. Further, even if the Court were to locate such a holding, any error in this case was harmless in light of the overwhelming evidence presented by the prosecution. However, in light of the intra-circuit conflict over mutually exclusive defenses and the applicability of *Zafiro*, the Court believes it appropriate to issue a Certificate of Appealability.

Accordingly, **IT IS HEREBY ORDERED** that:

1. The findings and recommendations filed December 10, 2007, are adopted to the extent they are consistent with this Order;
2. Petitioner's application for a writ of habeas corpus is DENIED;
3. The Clerk shall enter judgment accordingly; and

17

4. A Certificate of Appealability shall issue.

Dated this the 29th day of September 2008.

                                                    /s/ James K. Singleton, Jr.
                                                    **JAMES K. SINGLETON, JR.**
                                                         United States District Judge